## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WILLIAM MERVIN MILLBURG, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-3298 |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff William Mervin Millburg, Sr., appeals from the denial of his application for Social Security Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c (collectively Disability Benefits).  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Millburg has filed a Motion for Summary Judgment and Memorandum of Law in Support of Remand/Vacate of Decision Denying Disability (d/e 14), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 17).  This matter is before this Court for a Report and

Recommendation.  For the reasons set forth below, this Court recommends that the decision of the Commissioner should be REVERSED and REMANDED.

## STATEMENT OF FACTS

Millburg was born February 14, 1971.  He completed high school.  He previously worked as an Emergency Medical Technician (EMT) and a general clerk.  On August 5, 2009, Millburg resigned from his job as an EMT with the Morrisonville Illinois Community Ambulance Service.  Millburg stated in his letter of resignation that he was resigning due to his physical condition and health problems.  Millburg did not work thereafter.  Millburg applied for Disability Benefits on March 9, 2009.  Certified Transcript of the Record of Proceedings before the Social Security Administration (R.), at 160.  The application was denied on May 25, 2011.  R. 157-79.  Millburg reapplied for Disability Benefits on October 18, 2012.  Millburg alleged he became disabled on May 26, 2011.  R. 15.  Millburg suffered from disorders of the spine, fibromyalgia, cardiomyopathy, bilateral carpal tunnel and cubital tunnel syndrome, obstructive sleep apnea, asthma, obesity, and depression.  R. 18, 23, 41, 346.

On May 7, 2010, Millburg underwent a cardiac catheterization.  The catheterization showed mild coronary artery disease and a left ventricle ejection fraction of 60 percent.  R. 981.

On June 16, 2010, Millburg underwent neurolysis surgery to relieve compression of the ulnar nerve at the left cubital tunnel in his left elbow. R. 965-66.

On July 8, 2010, Millburg saw Dr. Mark Hansen, M.D., for tremors in his hands.  Millburg reported that the tremors had been going on for a couple of months.  Millburg reported that he did not have any muscle pain, stiffness, or weakness.  Dr. Hansen assessed cubital tunnel syndrome and planned to refer Millburg to a neurologist.  R. 738-39.

On December 10, 2010, Dr. Kristina Naseer administered lumbar epidural steroid injections into Millburg's spine for myofascial pain due to lumbar degenerative disease.  R. 528-32.

On January 5, 2011, Millburg saw orthopedic surgeon Dr. Timothy VanFleet, M.D.  Millburg complained of longstanding chronic thoracic back pain that began twenty years ago.  The pain did not radiate into his legs. He said that physical therapy did not help very much. He reported that he took pain medication.  Millburg reported that he did about three hours of water therapy a day.  Upon examination, he was alert and cooperative.  He

was 5'2 and 225 lbs.  He was able to stand upright and ambulate across the room.  There was some palpable discomfort across the thoracolumbar junction.  Millburg had good range of motion at the hips and knees. Reflexes were symmetric.  Millburg's strength was 5/5 and his sensation was intact. Spinal x-rays showed some thoracolumbar wedging deformities at three conservative vertebral bodies consistent with Scheuermann's.[1] Millburg had some disc space narrowing at the thoracic spine. The lumbar spine was unremarkable except for the thoracolumbar junctional changes. Dr. Van Fleet assessed chronic back pain and recommended continuing with regular exercise.  R. 524.

On January 11, 2011, Millburg underwent a sleep study.  At the time, Millburg was 62 inches tall and weighed 225 pounds.  He had a Body Mass Index (BMI) of 41.[2]  The sleep study showed obstructive sleep apnea, and indicated that Millburg should use a CPAP machine when sleeping at a pressure of 12 cm of water.  R. 701-02. [3]

On January 24, 2011, Millburg saw Dr. Hansen for chest pain, possible sleep apnea, and obesity.  Millburg had recently undergone a cardiac workup, which did not reveal any problems.  Millburg also reported

---

[1] Scheuermann disease is osteochondrosis (degeneration followed by regeneration and recalcification) of the vertebrae.  Dorland's Illustrated Medical Dictionary (32$^d$ ed. 2003) (Dorland's), at 1345, 1675.
[2] A person with a BMI of 30 or above is considered obese.  SSR 00-3p, 2000 WL 33952015, at *2 (May 15, 2000).
[3] CPAP means Continuous Positive Airway Pressure.  See Dorland's, at 427..

increasing memory problems.  Millburg reported that he applied for a CPAP machine through Medicaid and was waiting for approval. On examination, Millburg's strength and sensation in his extremities were within normal limits.  Dr. Hansen assessed esophageal reflux and obstructive sleep apnea.  R. 697, 700.

On February 21, 2011, Millburg saw Dr. Hansen.  Millburg reported having twitching in his hands and numbness in his hands bilaterally.  On examination, Millburg weighed 228.125 pounds.  His strength and sensation in his extremities were within normal limits.  Dr. Hansen assessed carpal tunnel syndrome.  Dr. Hansen recommended that Millburg continue to wear a brace on his right hand at night.  Dr. Hansen referred Millburg to Dr. Claude Fortin, M.D., for an EMG/nerve conduction study.[4] R. 688, 691.

On April 4, 2011, Millburg saw Dr. Hansen for a follow-up for back pain.  Millburg complained of carpal tunnel symptoms in both hands. Millburg said he would be undergoing an EMG in June.  He said he had chronic low back pain.  He wore a brace and took Flexeril and Vicodin daily.  Millburg reported that he was trying to lose weight.   Millburg weighed 233 pounds at the visit.  On examination, Millburg had numbness

---

[4] EMG means electromyogram.  See Dorland's, at 602, 608.

in both hands.  He had normal strength in his extremities.  Dr. Hansen

prescribed a brace for his left hand.  R. 679, 682.

On April 20, 2011, Millburg saw Dr. Hansen complaining of migraines.

The migraines were difficult to control.  The migraines were probably worse

because Medicaid would not approve his CPAP for obstructive sleep

apnea.  Millburg said he had headaches five to seven days a week in

unpredictable intervals.  He reported that the headaches could last for

hours.  He also mentioned a fine tremor in the hands that comes and goes.

On examination, Millburg's strength and sensation in his extremities were

within normal limits. Millburg also said that he needed paperwork

completed for his disability hearing. R. 674, 677.

On June 3, 2011, Millburg saw neurologist Dr. Pavan Bhargava, M.D.

for evaluation for possible essential tremor.  Dr. Bhargava noted that

Millburg had a history of congenital hydrocephalus with ventriculoperitoneal

shunt surgery as a child to relieve pressure in the skull.[5]  Millburg

complained of tremor in his left hand.  Millburg reported that the tremor

began two years earlier.  He experienced the tremors when he tried to hold

an object in his left hand.  Millburg reported a slight tremor in his right hand.

The tremor was worse when he was tired or anxious.  Millburg reported that

---

[5] Hydrocephalus is a condition that causes an accumulation of fluid in the skull that causes pressure in the skull.  See Dorland's, at 877-78,

he had been denied disability three times.   Millburg said that the primidone prescribed at the last visit was not helping much. Dr. Bhargava noted a history of pain and numbness over both hands and ulnar nerve compression.  On examination, Millburg's sensory system was intact. Millburg's gait was good except for tandem gait and involuntary movements.  Millburg had some postural tremor predominantly in the left hand with mild intention tremor.  There was numbness in the hands with Phalen's maneuver.  Dr. Bhargava assessed possible essential tremor exacerbated by underlying anxiety.  Dr. Bhargava prescribed a higher dose of primidone and ordered a nerve conduction and EMG study of Millburg's ulnar nerves.  R. 1131-32.

On June 21, 2011, neurologist Dr. Allen DevlescHoward, M.D., performed an EMG and nerve conduction study on Millburg.  The study revealed some changes in the median and ulnar nerves, but it was generally comparable to an earlier study.  R. 1124-25.

On June 3, 2011, Millburg saw Dr. Hansen complaining of back pain. Millburg told Dr. Hansen that he had been turned down for disability for the third time.  Millburg stated he had chronic back pain and had seen multiple neurosurgeons, but no one felt confident in doing surgery. Millburg reported that he was "very debilitated" by his back pain.  He stated he could never

sit more than twenty minutes without having pain and having to get up. Millburg said the pain lessened slightly when he got up and moved around, and the pain started "building" when he sat again.  Millburg stated that he could not flex or extend well because of pain. Millburg reported that he felt "pretty miserable."  Millburg stated that his pain medication only took the edge off the pain.  He reported pain from the interscapular area down to the sacrum (i.e., from between the shoulder blades to the base of the spine).[6] On examination, Dr. Hansen noted back pain from the intrascapular area down to the sacrum and pain with rotational movement of the spine at about thirty degrees.  Dr. Hansen increased Millburg's medication and recommended an EMG and nerve conduction study of the lower extremities to check for nerve entrapment.  R. 665, 668.

On June 14, 2011, Millburg underwent a lumbar spine MRI.  The MRI showed broad-based disc herniation at T11-12 with some flattening along the right distal cord, but no definite cord impingement or signal change in the cord.  The MRI also showed some very mild disc bulging at L2-3, L3-4, and L4-5, but no herniation or stenosis, and no definite foraminal narrowing.  R. 993.

---

[6] See Dorland's, at 1662, 1673.

On June 24-29, 2011, Millburg was hospitalized for cellulitis in the right lower leg, with probable sepsis. R. 873-932.  Millburg's white blood cell count was 22,400 at the time of admission.  R. 659.  Millburg said that he had been free from exacerbation of his leg condition by treatment that included wearing TEDS compression stockings when on his feet and elevating his legs at rest.  Millburg reported that recently it had been too hot to wear the TEDS.  He said that on the morning of June 24, he had a fever of 103 and redness in his right lower leg. R. 906.  Millburg reported that he was disabled from his current occupation as nursing assistant.  R. 908.  Millburg also reported pain related to his back. R. 875.

On examination, Millburg had an area of redness and tenderness on the distal right shin.  R. 888.  A venous Duplex Doppler study was negative for deep vein thrombosis (DVT).  R. 157.  On June 27, 2011, an MRI of the thoracic and cervical spine revealed no significant abnormality.  The MRI showed a mild disc bulge at T11-12 impressing on the ventral thecal sac. R. 920.  Millburg was told to continue compression treatment and antibiotics.  R. 877.

On August 9, 2011, Millburg underwent a thoracic epidural injection at the T11-12 level of his spine.  R. 868.  Dr. Narla Koteswara, M.D., performed the procedure.  Dr. Koteswara scheduled another injection in

three weeks.  Dr. Koteswara stated, however, that she did not see any point in proceeding if Millburg received no benefit from the injection. R. 868-69.

On August 19, 2011, Millburg saw Dr. Hansen complaining of neck and back pain. Dr. Hansen noted that several surgeons had seen Millburg and all concluded that surgical correction was not indicated.  Dr. Hansen stated he had kept narcotic pain medication to a minimum.  On examination, Millburg had pain with cervical spine range of motion, with pain with rotation thirty degrees right or left and with flexion to thirty degrees.  Millburg also had low back pain.  Dr. Hansen assessed chronic lower back pain and lumbar disc degeneration, cervicalgia, cervical radiculopathy, and lumbar radiculopathy.  R. 643, 646-47.

On August 31, 2011, a lower limb venous Duplex Doppler study showed no evidence of venous thrombosis and no superficial venous reflux.  R. 541-42.

On September 2, 2011, Millburg saw Dr. Bhargava for a follow up visit regarding possible essential tremor.  Dr. Bhargava stated that a recent EMG and nerve conduction study showed right cubital tunnel syndrome and left cubital tunnel syndrome unchanged from previously, but no carpal tunnel syndrome in the right hand and no evidence of cervical

radiculopathy. Millburg reported that his possible essential tremor was better with primidone.  On examination Dr. Bhargava noted mild intrinsic muscle weakness in the right hand.   Dr. Bhargava increased the primidone dose and referred Millburg for possible right cubital tunnel release. R. 1103-04.

On September 12, 2011, Millburg saw Dr. Hansen for back pain.  On examination, Millburg weighed 238.6 pounds.  Dr. Hansen assessed back pain and lumbar radiculopathy.  Dr. Hansen's plan included approving Millburg for a handicap placard.  R. 637-38.

On September 30, 2011, Millburg underwent neurolysis surgery to relieve compression of the ulnar nerve at the right cubital tunnel.  R. 859.

On November 4, 2011, Millburg saw Dr. Hansen for chronic pain.  Dr. Hansen stated that Millburg was depressed due to his chronic pain. Dr. Hansen advised Millburg that he needed psychiatric help.  R. 629, 632.

On November 7, 2011, Millburg underwent a mental health crisis assessment at the Christian County, Illinois, Mental Health Association (Mental Health Association).  Millburg reported that he had five bulging discs in his back causing him chronic pain.  Millburg reported that he was depressed and frustrated due to the pain.  Millburg said he could not do anything to make it better. He stated he wanted to go camping and go to

Boy Scouts with his teenage son, but the pain was too great. He said he

was crying to his wife all the time and he apologized for everything he did.

Millburg stated he needed help coping better.  He was currently on BuSpar

and Cymbalta.  The licensed clinical social worker conducting the

assessment diagnosed Millburg with major depressive disorder, recurrent

and generalized anxiety disorder.  The social worker gave Millburg a Global

Assessment of Functioning (GAF) score of 50.  R. 1398-99.

A GAF is measure of a clinician's judgment as to the individual's

overall level of functioning or the severity of the individual's symptoms.

American Psychiatric Association, <u>Diagnostic and Statistical Manual of

Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR)</u>, at 32-34.  A

GAF score of 50 indicated either serious symptoms or serious functional

limitations.  <u>Id.</u>, at 34.  The American Psychiatric Association no longer

recommends the use of the GAF score.  American Psychiatric Association,

<u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-

5)</u>, at 16.  The ALJ, however, did not question the validity of GAF scores in

his decision.

On November 9, 2011, Millburg saw sleep specialist Dr. Jerry Reedy,

M.D., complaining of poor sleep.  Dr. Reedy stated that Millburg used a

CPAP machine to sleep.   The data recorded on the CPAP machine

showed good compliance by Millburg.  Millburg used the CPAP every night for about 4 ½ hours.   The data also showed that the CPAP was effective in controlling his sleep apnea.  Millburg reported that he woke up every night when his muscle relaxant Flexeril wore off.  Millburg's wife said he jerked in his sleep.  Dr. Reedy scheduled a sleep study.  R. 849-51.

On November 14, 2011, Millburg returned to the Mental Health Association.  Millburg again complained of pain from five bulging discs. Millburg said he had tried every method of treatment, but nothing helped. He was willing to try anything to control his pain and allow him to be functional again. Millburg said he felt very depressed and stressed; he said he felt useless because he could not do anything.  The licensed clinical professional counselor who saw Millburg observed that he was in obvious pain and had difficulty sitting for any length of time.  The licensed clinical professional counselor assessed major depressive disorder, recurrent and generalized anxiety disorder.  The counselor gave Millburg a GAF score of 50.  R. 1396-97.

On November 28, 2011, Millburg returned to the Mental Health Association.  Millburg stated that his pain was overwhelming and he had become more and more depressed and anxious. He said he had tried almost everything for his pain, but nothing worked.  Millburg stated he went

to the YMCA daily to do water exercises. He said he was taking Seroquel and Cymbalta. The licensed clinical professional counselor assessed major depressive disorder, recurrent and generalized anxiety disorder. The counselor gave Millburg a GAF score of 50. R. 1394-95.

On November 28, 2011, Millburg underwent a sleep study. Dr. Reedy conducted the study. The study showed that obstructive apneas and hypopneas were controlled with the current CPAP titration of 12 and 14 cm of water, but respiratory effort related events and snoring remained problematic. Dr. Reedy recommended a higher water pressure (16cm). Dr. Reedy also recommended a "risk factor modification for disorders associated with obstructive sleep apnea." Millburg thereafter saw Dr. Reedy to discuss the sleep study results. Dr. Reedy increased Millburg's CPAP pressure to 16 cm of water on a trial basis. R. 1232.[7]

On December 2, 2011, Millburg saw Dr. Bhargava for possible essential tremor. On examination, Millburg had a postural tremor predominantly on the left hand with a mild intention tremor. Millburg had trouble drawing an Archimedes spiral with his left hand. Tinel's sign was positive over the right cubital tunnel.[8] Dr. Bhargava assessed possible

_____

[7] The document is erroneously dated November 2, 2011. The body of the document contains a discussion of the November 20, 2011 sleep study. The visit clearly occurred after the sleep study.
[8] Tinel's sign is positive if a tingling feeling occurs when the nerve is tapped in a specific location. See Dorland's, at 1716.

essential tremor that was improving with medication.  Dr. Bhargava also noted that Millburg's right cubital tunnel seemed to be symptomatic. R. 1072.

On December 7, 2011, Millburg saw Dr. Hansen for back pain and leg pain.  On examination Dr. Hansen noted chronic back pain that hurt with range of motion, and went into both legs.  Dr. Hansen stated that Millburg had lumbar radiculopathy by EMG.  Dr. Hansen planned to refer Millburg to Dr. Fortin for radiculopathy pain.  R. 620, 623.

On January 4, 2012, Millburg saw Dr. Hansen.  Millburg reported that his neck pain had worsened and he felt tired all the time.  Millburg reported that he still had pain, numbness, and tingling in the hands.  His EMG was normal.  Millburg reported that he was doing water exercises for four hours a day.  Millburg admitted he was not following a diet for obesity.  He reported that he had to take a nap every day.  On examination, Millburg had normal sensation and strength in his extremities.  Dr. Hansen recommended a low carb diet and to keep exercising.  R. 614, 618.

On January 6, 2012, Dr. Fortin gave Millburg an L5-S1 lumbar epidural steroid injection for pain due to a right S1 radiculopathy.  Dr. Fortin stated that the radiculopathy was indicated by an EMG study.  R. 544-45.

On February 17, 2012, Dr. Fortin gave Millburg bilateral sacroiliac joint injections for pain due to bilateral sacroiliitis.  R. 550-51.

On February 24, 2012, Millburg saw orthopedist Dr. Paul Smucker, M.D. for back pain.  Millburg reported that he had chronic pain in the thoracic and lumbar spine since the early 1990s.  Millburg reported that the pain started when he injured his back while transferring a patient.  He said he had chronic diffuse axial back pain.  Millburg said the pain did not radiate into his extremities. Millburg reported that he had tried epidural steroid injections, narcotics, physical therapy, chiropractic treatment, and use of a TENS unit.  He reported that he no longer took narcotics because the medication did not help.  Upon examination, Millburg had a normal gait and ambulated without difficulty.  Millburg's mood was appropriate with a somewhat flat affect.  Millburg had normal range of motion in the hips, shoulders, and cervical spine.  His motor strength was 5/5 in his extremities.  Hoffmann's was mildly positive bilaterally.[9]  Provocative maneuvers were negative. There was no tenderness through the low back or greater trochanters.[10]  R. 522.

Dr. Smucker took x-rays of Millburg's spine.  The cervical spine x-rays showed diffuse mild cervical degenerative changes.  The lumbar spine

[9] Hoffman's phenomenon is increased excitability to electrical stimulation in the sensory nerves; usually the ulnar nerve is tested.  Dorland's, at 1430.
[10] The trochanter is the part of the femur just below the head and neck.  Dorland's, at 1970.

x-rays showed mild degenerative disc disease with diminished interspace height at multiple levels. The thoracic spine x-rays showed moderately diminished space height in the lower thoracic. The x-rays showed some thoracolumbar wedging deformities through the thoracolumbar junction consistent with Scheuermann's.   R. 522.

Dr. Smucker assessed chronic axial thoracolumbar pain greater than cervical pain, and diffuse hyperreflexia and positive Hoffmann's, suggesting a possible upper motor neuron issue.  Dr. Smucker recommended that Millburg see a neurologist or neurosurgeon to check the status of the shunt/hydrocephalus.  R. 522-23.

The same day, February 24, 2012, Millburg saw Dr. Reedy for a follow up on Millburg's sleep apnea.  Millburg reported that he was tolerating the increased CPAP water pressure.  Millburg reported that he had problems sleeping due to pain.  Millburg reported that he slept five to six hours a night and napped for about an hour some days.  The data downloaded from the CPAP showed that Millburg used the CPAP about four hours a day.  Dr. Reedy recommended that Millburg use the CPAP more often.  R. 1231.

On March 12, 2012, Millburg underwent a CT scan of his head and a chest x-ray.  The CT scan showed that Millburg's intraventricular shunt was

in the right parietal approach with its tip in the right lateral ventricle and
moderate hydrocephalus.  The radiologist assessed moderate
hydrocephalus.  On March 13, 2012, Millburg underwent a chest x-ray.
The chest x-ray showed cardiomegaly and a right-sided neck shunt with tip
terminating overlying the right mid chest.  R. 822, 824.

On March 27, 2012, Millburg underwent an echocardiogram.  The test
showed that Millburg had a left ventricular ejection fraction of 55-60%; no
significant valve stenosis or regurgitation; normal cardiac chamber size;
and no pericardial effusion.  R. 819.

On April 11, 2012, Millburg underwent an MRI of the brain.  The MRI
showed marked ventriculomegaly.   The shunt was seen within the right
lateral ventricle.  The radiologist concluded that the recent CT scan gave a
better image of Millburg's shunts.  R. 818.

On May 31, 2012, Millburg saw Dr. Hansen for a follow up
examination.  Millburg complained of back pain, depression, and numbness
in the hands and feet.  On examination, Millburg was 62.5 inches tall and
weighed 250.4 pounds.  Millburg's strength and sensation were within
normal limits.  R. 588, 592.

On June 27, 2012, Millburg saw Dr. Hansen.  Millburg complained of
fatigue, nausea, and back pain.  Dr. Hansen stated he would not prescribe

a narcotic for the chronic pain because nothing was identified in workup by multiple physicians and specialists.  R. 583.

On July 14, 2012, Millburg went to the hospital emergency room with bilateral leg swelling.  Millburg was wearing compression stockings. Millburg reported that he wore compression stockings consistently. Millburg reported that the swelling was irritating when walking, but he did not have pain. Millburg also reported some increased shortness of breath and some nausea (Exhibit B-5F, p. 35).  On examination, Millburg had 3+ pitting edema in the legs, but was otherwise normal.  Millburg was assessed with edema and prescribed clindamycin.  R. 797, 800.

On August 22, 2012, Millburg saw Dr. Hansen with edema on his feet.   Millburg reported, "[W]as on Lasix and helped a little then stopped. Swelling came back and hasn't worked as well.  Back to wearing compression stockings." On examination, Millburg was 5'2 1/2" tall and weighed 252.4 lbs. for a Body Mass Index (BMI) of 45.29.  Dr. Hansen noted 1+ edema in Millburg's extremities. Dr. Hansen renewed the prescription for furosemide (generic for Lasix) and told Millburg to continue using the support stockings.  R. 577, 581.

On August 26, 2012, Millburg's cousin Debbra Kaye Dunn Perce, submitted a letter on behalf of Millburg.  Perce stated that they grew up

together.  She stated that Millburg had multiple surgeries as a child.  She stated that he worked through adversities.  She stated, "A few years ago, his health condition has really begun to cause him severe problems and it became necessary for him to give up his work."  R. 347.

On August 27, 2012 Millburg returned to the Mental Health Center. He saw psychiatrist Dr. Rhi Patil, M.D. for a psychiatric evaluation.  Millburg reported that he had been struggling with severe depression, feeling helpless, hopeless, and losing interest. He "knows talks of suicide." He reported that he had been teary-eyed and cried easily. He said he could not shut off his mind at night. On examination, Dr. Pail noted that Millburg was alert, but anxious with a depressed mood; his thought process was normal other than racing thoughts; his memory and orientation were intact; and his insight and judgment were limited.  Dr. Patil noted that Millburg had an average intellect, but limited attention and concentration.   Dr. Patil noted, "No suicidality."  Dr. Patil diagnosed major depressive disorder and gave Millburg a GAF score of 55.  A GAF score of 55 indicated either moderate symptoms or moderate functional limitations.  DSM-IV-TR, at 34.   Dr. Patil prescribed Wellbutrin, Cymbalta, Risperdal, and Trileptal.  R. 1054.

On October 1, 2012, Millburg underwent an ankle brachial index test. The test showed no evidence of disease in Millburg's toes or lower extremities.  R. 555.

On November 2, 2012, Millburg underwent an MRI of his cervical, thoracic, and lumbar spine.  The cervical MRI showed at C6-7 mild bilateral neural foraminal stenosis from facet arthropathy, at C7-T1 mild facet athropathy, and no canal or neural foraminal stenosis, no compressive disc herniation, and a very small non-expansile syrinx in the lower cervical cord, with no change since 2011.  The thoracic spine MRI showed small to moderate size disc herniation at T10-11and T11-12 and a very small non-expansile syrinx in the upper thoracic cord. The lumbar spine MRI showed no spinal canal or neural foraminal stenosis.  R. 559-62.

On November 5, 2012, Millburg saw neurosurgeon Dr. Jeffrey Cozzens, M.D. for a consultation.  On examination, Dr. Cozzens found normal strength, sensation, reflexes, and coordination.  Dr. Cozzens diagnosed Millburg with myofascial pain syndrome (fibromyalgia).  Dr. Cozzens told Millburg that he would not benefit from surgery.  Dr. Cozzens told Millburg he needed to see a rheumatologist to treat his myofascial pain syndrome.   R. 1069-70.

On November 7, 2012, Millburg underwent an MRI of his upper right extremity due to pain and swelling in his right hand.  The MRI showed mild tenosynovitis involving the extensor carpi radialis longus and brevis tendons, and mild to early moderate arthritis involving the first carpometacarpal joint. R. 764.

On November 29, 2012, Millburg underwent a chest x-ray.  The x-ray showed mild interstitial edema.  The x-ray also showed cardiomegaly and bilateral pleural thickening, likely extra-pleural fat.  R. 1224.

On December 3, 2012, Millburg saw psychiatrist Dr. Patil.  Millburg reported that he was still depressed.  Millburg's wife said he was a little better, but he still cried easily and became depressed.  On examination, Millburg was alert with intact orientation and memory, normal thinking processes, and average intellect.  Millburg had an anxious affect, and depressed mood.  He had limited insight and judgment, and fair attention and concentration. Dr. Patil diagnosed major depressive disorder and gave Millburg a GAF score of 70.  A GAF score of 70 indicated either some mild symptoms or some functional limitations.  DSM-IV-TR, at 34.   Dr. Patil increased Millburg's dosage of Wellbutrin dosage.  R. 1052, 1268.

On December 13, 2012, Millburg saw rheumatologist Dr. Anne Miller, M.D.  Millburg reported that he had low back pain since a workplace injury

in 1992.  He said that in the past couple of years, the pain had generalized

to the back of the neck with headaches, posterior shoulders, and hips.

Millburg rated his back pain at 7/10 without radiation.  Millburg reported that

nothing made his pain better.  Millburg reported that he could not sleep

more than four to five hours due to pain.  Millburg said that sitting, standing,

and lying down made his pain worse and stated he could not maintain a

position for more than twenty minutes.  Millburg reported that in the past

year his right lateral hip started hurting and that sitting and standing made

the pain worse.  He said his fingers had become stiffer in the past couple of

months and said he had been diagnosed with carpal tunnel syndrome.

Millburg stated he still felt depressed despite medication. Millburg stated he

did water exercise daily, but the exercises did not help anymore.  R. 1061.

On examination, Dr. Miller found that Millburg was 5' 2 3/4" tall and

weighed 249.4 lbs. for a BMI of 44.48.  Millburg had full range of motion

without pain in all joints, and tenderness in the traps, SS origins, posterior

neck, anterior chest, right lateral hip, midline LS junction, and

paravertebrals.  Dr. Miller noted left thenar atrophy; positive Tinel and

Phalen signs at the right hand.[11]  Dr. Miller assessed back pain.  Dr. Miller

noted that Millburg had a fibromyalgia component in that he had a pain

---

[11] Phalen's sign is positive if the numbness develops in a hand when the wrist is fully flexed or extended for 30 to 60 seconds.  Dorland's, at 1714, 1896.

trigger at the lower back.   Dr. Miller assessed that Millburg's pain was due to chronic muscle strain/irritability that may be aggravation by obesity and deconditioning.  Dr. Miller recommended weight loss, exercise, a conditioning program, muscle relaxants, and analgesics.  Dr. Miller also recommended follow up nerve conduction and EMG studies for carpal tunnel syndrome.  R. 1061-65.

On December 28, 2012, Dr. Hansen wrote a letter regarding Millburg's condition.  The body of the letter stated:

> This is to document that my patient is disabled. His first disabling component is chronic back pain with degenerative disc disease and arthritic changes of the spine in both the neck and lumbar area.  Second, he has chronic right S1 radiculopathy documented by EMG by Dr. Claude Fortin multiple times. Third, he has hypertrophic cardiomyopathy monitored by Dr. Cahill at Springfield Clinic Cardiology.  Fourth is obstructive sleep apnea which he wears CPAP for and is treated. The fifth is that he sees a psychiatrist and his interaction with the general public is reduced because of his severe depression and anxiety that he is being treated for. I think all of five of these conditions together significantly and totally disable this individual.

R. 1240.

On February 11, 2013, Millburg saw Dr. Patil.  Millburg reported that he was depressed with no energy.  He reported that he was isolating and withdrawing himself.  He said his pain was increasing.  On examination, Millburg was alert with an anxious affect and labile mood.  His thought

process was normal, memory and orientation were intact, insight and judgment was limited, and attention and concentration limited.  Dr. Patil assessed major depression and assigned a GAF score of 70.  Dr. Patil changed Millburg's medication from Wellbutrin to Celexa.  R. 1267.

On February 28, 2013, Millburg saw state agency physician Dr. Vittal Chapa, M.D., for a consultative physical examination.  Millburg reported that he quit working in 2009 due to pain.  Millburg stated he had fibromyalgia in his back and severe pain in the lower, mid, and upper back. Millburg stated that his neck hurt and he had headaches. Millburg reported that he had pinched nerves, multiple bulging discs, and tingling in his hands and feet.  Millburg reported that he hurt his back in 1992.  He reported that his symptoms were worsening and his back was deteriorating.  Millburg reported that he felt exhausted.  He reported doing water exercises daily. He said he wore a right wrist brace because of his cubital tunnel syndrome. Millburg stated he could not do any type of activity. He reported that he had cardiomyopathy and intermittent chest pain.  Dr. Chapa noted that Millburg had no history of angina.  Millburg reported that he did not sleep well and felt tired all the time.  Millburg reported that used a CPAP machine to sleep due to sleep apnea.  Millburg stated he slept with a pillow between his legs

and with wrist braces.  Millburg said that he had high blood pressure.
R. 1241.

On examination, Millburg was not in any acute distress.  He wore a
right wrist brace.   His blood pressure was 150/90.  Millburg was 5'4" tall
and weighed 252 pounds.  Millburg was able to bear weight and ambulate
without ambulatory aids.  Millburg displayed giveaway motor weakness of
the handgrips, with grip strength of 3/5.  Dr. Chapa found no muscle
atrophy in the extremities.  Millburg's sensation was normal; he had no joint
redness, heat, swelling or thickening; and had no paravertebral muscle
spasm.  Millburg could perform fine and gross manipulations with both
hands.  Millburg's range of motion of the joints was not reliable because
Millburg overreacted to the examination.  Dr. Chapa still found full range of
motion in all joints.  Straight leg raise was negative when seated, but when
supine Millburg complained of pain at about ten degrees on both sides.
Tinel's sign was negative at the wrists and elbows.  R. 1242-43.

Dr. Chapa assessed multiple joint pains, fibromyalgia, and sleep
apnea.  Dr. Chapa reviewed the MRIs of Millburg's back and found no
definite evidence of cervical radiculopathy or lumbar radiculopathy.
R. 1243.

On March 26, 2013, state agency psychologist Dr. Donna Hudspeth, Psy.D., completed a Psychiatric Review Technique Form, and a Mental Residual Functional Assessment form.  R. 192-93,196-98.  Dr. Hudspeth opined that Millburg's affective disorder of depression and anxiety imposed mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Hudspeth opined that Millburg had not experienced any episodes of decompensation of extended duration.  R. 192.  Dr. Hudspeth opined that Millburg was moderately limited in carrying out detailed instructions, but otherwise did not have significant functional limitations due to his mental condition.  Dr. Hudspeth opined that Millburg could understand, remember, and perform simple, routine one and two-step tasks in the work setting.  Millburg's interpersonal skills were adequate for communicating and relating in a vocational setting.  Millburg had the ability to adapt to work situations and changes that routinely occur in the workplace with reasonable support.  R. 196-97.

On April 1, 2013, a state agency physician Dr. Marion Panepinto, M.D. completed a Residual Functional Capacity Assessment form for Millburg.  Dr. Panepinto opined that Millburg could carry 20 pounds frequently and 10 occasionally; could stand and/or walk for six hours in an

eight-hour workday; could sit for six hours in an eight-hour workday; could

occasionally climb, stoop, kneel, crouch, and crawl; could frequently handle

and finger objects; and should avoid concentrated exposure to fumes,

odors, dusts, gases, and poor ventilation.  Dr. Panepinto opined that

Millburg had no other functional limitations due to his physical impairments.

R. 194-96.

On April 9, 2013, Dr. Edward Trudeau, M.D., performed nerve

conduction and EMG studies of Millburg's arms.  Millburg filled out a

questionnaire about his symptoms in which he reported extremity pain,

numbness, tingling and depression.  On examination, Millburg had diffuse

weakness in his upper extremities, discomfort with manual resistance

testing, and weakness of the ulnar-innervate intrinsics and APB bilaterally,

especially on the dominant right hand side.  The neurological examination

showed moderately severe bilateral carpal tunnel syndrome, with the right

greater than left; and bilateral cubital tunnel syndrome, essentially equal on

both sides.  R. 1361.

On April 18, 2013, the Social Security Administration Office in

Springfield, Illinois, sent 45 pages of Millburg's file by facsimile

transmission.  The transmission header only listed the receiving telephone,

not the intended recipient.  The Transmission included undated letters from

Millburg, Millburg's parents, and Millburg's pastor.  R. 458-61.  Millburg

stated in his written submission that he hurt his back in 1992 while working

as a nursing assistant.  He stated that he hurt his back when he got a

patient back into bed.  Between the injury in 1992 and sometime in 1994,

Millburg was on workers compensation, and then went back to work in the

medical records division of the same facility.  In 1994, he went to work for

an ambulance service as an EMT.  Millburg said that bending over and

taking care of patients made his back hurt worse.  Millburg worked as a

telecommunications clerk for the ambulance service for a short time, but

"sitting for short periods at a time was to[o] much, so I had to completely

stop working in August of 2009."  Millburg stated in the letter,

> Since [March 2009] my back has increased to at least a
> minimum of 5 bulging disc, at least 2 pinched nerves, arthritis,
> fibromyalgia, and now degenerative disc disease.  I have been
> told by a Dr. Smucker in Springfield, Illinois that my back is just
> going to continue to get worse.  I have numbness and tingling in
> my arms and hands, legs and feet, which continues to worsen.
> I constantly have and have had for numerous years severe
> headaches and neck aches.

Millburg said that due to his depression, "all I want to do is eat, which has

made my weight increase."  Millburg stated that he tried to lose weight, but

was unsuccessful.  He said he tried all types of physical therapy.  He stated

that he did water therapy five times a week.  He stated,

> I do get into the water as often as possible, trying to do every day; Monday through Friday, which in the beginning did help some but for the last couple of years had done nothing by trying to keep it from making issues worsen.

Millburg stated that he could no longer help his wife, but she had to help him now.  R. 460.

Millburg's parents, Ted and Phyllis Millburg, stated in their letter that Millburg had numerous surgeries as a child because of his hydrocephalus. They reported that he was confined to a wheelchair for much of his teenage years.  They reported that he had back problems when he went to work as an EMT, and those problems worsened over time.  They reported that doctors told Millburg that surgery would not help his condition.  They reported that Millburg's doctors told Millburg that he would not get better. They reported that Millburg had "5 confirmed degenerative discs."  They stated that Millburg would never get better and could not work.  R. 459.

Millburg's pastor, Helen Dayle Badman, reported that she observed "Millburg's increasing problems with not only mobility, but with pain management."  She stated that Millburg could not provide for his family because of his problems with mobility and pain.  She reported that during Vacation Bible School, Millburg stayed in one location because "his back was very compromised."  She opined that he qualified for disability.  R. 458.

On July 15, 2013, Millburg saw Dr. Patil.  Millburg reported being severely depressed with a lack of motivation and feeling of hopelessness and helplessness. He denied suicidal ideation.  He stated he had been struggling and his body hurt.  On examination, he was alert with a depressed mood and anxious affect. Thought processes were normal, intellect was average, and memory and orientation were intact.  Millburg's attention, concentration, insight and judgment were limited.  Dr. Patil assessed major depressive disorder and assigned a GAF score of 55. R. 1265.

On August 10, 2013, state agency psychologist Dr. Kirk Boyenga, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Capacity Assessment form for Millburg.   Dr. Boyenga concurred in Dr. Hudspeth's assessment of Millburg's mental condition and his function limitations due to his mental condition.  R. R. 224-25, 228-30.

On August 14, 2013, state agency physician Dr. James Hinchen, M.D., completed a Physical Residual Assessment form for Millburg.  Dr. Hinchen concurred with Dr. Panepinto's opinions regarding Millburg's physical residual capacity.  R. 226-28.

On September 23, 2013, Millburg saw Dr. Patil again.  Millburg was worried about his son, who turned 18 years old and moved away to another

town.  Millburg said he would probably lose his public aid card because his son had moved out.  On examination, Millburg was alert with a labile mood and anxious affect.  His thinking processes were impaired, but memory and orientation were intact.  His insight and judgment were limited.  Attention and concentration were also limited. Dr. Patil assessed major depressive disorder and assigned a GAF score of 55.  R. 1374.

On December 16, 2013, Millburg saw Dr. Patil.    Dr. Patil stated that Millburg was struggling.  Millburg lost his medical card and then got it back.  Millburg said he was worried about his medication.  On examination, Millburg had a depressed mood with anxious affect.  His thinking process was normal, his memory was intact, and his insight and judgment were limited.  Dr. Patil assessed major depressive disorder and assigned a GAF score of 55.  R. 1307.

On February 3, 2014, Millburg saw Dr. Tom Ala, M.D., at the Southern Illinois University Healthcare Memory Clinic.  Millburg reported that he had increased problems with long-term and short-term memory over the past two years. He stated he was having more trouble keeping his medications and finances straight, but admitted he had not made any mistakes with his medications.  Millburg reported that on two or three occasions, he wrote a check to pay a bill but did not deposit funds into his

checking account to cover the check.  Dr. Ala, noted that the memory loss
had occurred in association with multiple medication changes in the past
two or three years.

On physical examination, Millburg's motor exam was 5/5 motor exam
with no drift, his sensory examination was intact, his fine motor movements
were accurate and symmetrical.  Millburg walked the room with a
moderately wide base and he took relatively short steps with reduced arm
swing.  He took extra steps when turning.  He could not tandem walk and
could not keep his balance during the Romberg test.  R. 1271.[12]

After completing the memory examination of Millburg, Dr. Ala
assessed Millburg with a very mild memory loss probably due to the
multiple medications that Millburg was taking.  Dr. Ala recommended an
MRI and better control of his back pain in order to reduce the number of
medications that Millburg was taking.  Dr. Ala recommended that Millburg
ask Dr. Patil to consider reducing the dosage of two psychotropic
medications primidone and risperidone.  R. 1270-71.

On March 17, 2014, Millburg saw Dr. Patil.  Millburg reported being
very depressed, feeling tired, and feeling hopeless and helpless.  On
examination, Millburg had a depressed mood with an anxious affect.

---

[12] The Romberg test involves standing with the feet close together and eyes closed.  See Dorland's, at
1715.

Millburg's attention and concentration were fair.  Dr. Patil assessed major depressive disorder and assigned a GAF score of 55.  R. 1313.

On June 9, 2014, Millburg saw Dr. Patil.  Millburg reported that he was depressed.  Dr. Patil noted that Millburg complained about back problems, financial problems, and upcoming surgery for his wife.  He also complained about his son joining the Marines and leaving for boot camp.  Millburg reported that he was clenching his jaw.  Millburg said he was stressed out and could not deal with it.  On examination, Millburg was depressed and had an anxious affect.  He was alert with normal thought processes, intact memory and orientation.  Millburg had average intelligence, but limited concentration, attention, insight and judgment.  Dr. Patil assessed major depressive disorder and assigned a GAF score of 56.  R. 1324.

In June 2014, Millburg's wife Teresa Millburg began receiving ongoing service of an in-home personal assistant through Illinois Division of Rehabilitation Services (DORS).  R. 1427-31, 1337.

On August 12, 2014, an undated letter from Millburg's brother Doug Millburg was sent by facsimile transmission to the Social Security Administration.  R. 498-99.  Doug Millburg stated that "over the last couple of years [Millburg's body] has degraded so badly that he pretty much had to

quick [sic] pretty much everything he enjoyed."  Doug Millburg stated that
Millburg had to quit his job because "it required minimal lifting.  Doug
Millburg stated that Millburg "had to quit scouting because he was unable to
keep up with children a quarter of his age due to the pain he was in."  Doug
Millburg stated that Millburg had to stop assisting at church because he
could not stand for 10 minutes.  Doug Millburg stated Millburg was "now in
constant pain:  Either it be standing, sitting, or even laying down, he is
always in pain."   Doug Millburg stated that Millburg would rather work, but
he could not because of his pain.  Doug Millburg concluded, "He is just
unable to do ANYTHING without being in pain."  R. 498 (emphasis in the
original).

On August 20, 2014, the Administrative Law Judge (ALJ) conducted
an evidentiary hearing.   The ALJ conducted the hearing in Peoria, Illinois.
Millburg, his attorney and expert Bob Hammond all appeared by
videoconference from Springfield, Illinois.  R. 113.

Millburg testified.  Millburg graduated high school and took some
college courses.  He lived alone with his wife in a ground floor,
handicapped accessible apartment.  His wife was born with spina bifida
and was on SSI.  Millburg had three children that were all grown.  In
addition, he and his wife reared a boy in their home from the time he was

12 until 18.  The young man was 19 at the time of the hearing and was out of the home.  R. 117-19.

Millburg last worked in 2009.  Millburg stated that he resigned from his last job because his "pain was getting too severe."  R. 120.

Millburg provided a long list of medications that he was taking.  He testified that most of the medications worked as intended for him except for the pain medications.  Millburg indicated that he took naproxen and Levetiracetam (generic for Keppra) for pain.  Millburg said that he did not take narcotic pain killers on a regular basis.  On occasion, he took the narcotic pain medication Norco.  R. 121-22.  Millburg testified that his medications caused drowsiness and memory problems.  Millburg related that he started forgetting where he is going or what he is doing.  R. 122, 132-32.  Millburg stated that the doctor at the memory clinic recommended reducing the dosage on one medication.  Millburg testified that the reduction did not help with his memory.  R. 132.

Millburg testified that he had depression and anxiety.  He testified that due to these conditions, he did not want to interact with other people.  He testified that he felt down on himself.  Millburg testified that he felt useless and unworthy.  Millburg went to counseling sessions at the Mental Health Center twice a week, in addition to seeing Dr. Patil periodically.  R. 132-33.

Millburg indicated that his depression affected his ability to concentrate.  He said he had a hard time staying on task.  He said that his wife helped him keep track of his medications because he could not concentrate enough to keep track himself.  R. 134.

Millburg testified that he had problems with discs in his back,

> What I've been told and – well, I have multiple bulging discs, the last I heard, at least five, if not more; multiple herniated discs; degenerative disc disease; fibromyalgia, arthritis.

Millburg said that he occasionally had "issues with numbness and tingling" in his extremities, including his hands and feet.  R. 134-35.  The ALJ asked counsel to provide a reference to the reports that showed multiple herniated discs.  R. 146.  In response, Millburg's counsel indicated that there was a disc bulging at L2-L3, L3-L4, and L4-L5, without disc herniation and broad based disc herniation at T11 and T12.  Millburg's counsel indicated that the "note" was in the DHS denial.  The ALJ indicated he would "look that up later".  R. 147.  The ALJ located a lumbar spine MRI which showed very mild disc bulging at L2-3, L3-4, L4-5, and broad based herniation at T11-12.  R. 27.

Millburg indicated that he tried physical therapy, but received no benefit,

> I've tried at least three to five different sessions of physical therapy.  Each time they try it, they look at me, I try to exercise

and they say there's nothing they can do for me.  I've done
water exercises due to physical therapy.  Sometimes it helps
and sometimes it won't.

R. 137.  Millburg said that he stopped water exercises because he no

longer could afford it.  Millburg testified that he tried epidural steroid

injections, but the injections only provided relief for a few days.  R. 137.

Millburg related that he had a shunt in his head due to his

hydrocephalus.  He said that he had  constant headaches, indicating that

he had the headaches all his life.  The headaches got worse as his back

condition worsened.  He stated that most of his headaches were at an 8 on

a scale of 1 to 10.  R. 138.  Millburg testified that the shunt was replaced in

the 1980s and rerouted in 1995.  R. 146.

Millburg testified that sitting during the hearing was causing extreme

pain.  The pain was "getting worse the longer I sit here."  Millburg said that

his back pain at the time was a 9 on a scale 1 to 10.  R. 138.  After the ALJ

explained his pain scale, Millburg testified that his pain was at a 7 or 8.  R.

144.  Millburg indicated that his pain was usually between a 5 and 7 on a

scale of 1 to 10.  Millburg testified that he was in pain every day.  Millburg

related that he could not remember a day when his pain was below a 5.

On bad days, his pain was 8 or 9.  He testified that he never rated his pain

as 10 out of 10 because the pain could always get worse.  R. 145.  Millburg

said that no doctor recommended back surgery.  R. 145-46.

Millburg testified that he could feed himself.  He could bathe and

dress himself, but those tasks have been getting harder to do.  R. 121-22.

Millburg indicated that he could not prepare meals.  When asked if he could

prepare meals, Millburg testified:

> No sir, not anymore; my wife has received an at-home aide,
> which is helping her and helping myself because I can no
> longer help take care of those kind of activities for her and
> myself.  R. 122

The aide worked 120 hours a month.  R. 123.  Before the aide started

working for his wife, Millburg made sandwiches for their meals.  Members

of their church also occasionally helped with meals.  R. 123-24.

The ALJ asked whether Millburg's wife received an in-home aide due

to the wife's recent shoulder surgery.  Millburg responded, "No, it was

based on her health and my health."  R. 125.  The ALJ then stated to

Millburg's counsel,

> And, counsel, since the claimant just testified that an
> assignment of the aide through DORS was also based on his
> health, I'm going to request that all the records, paperwork,
> analyses done by DORS in relation to that be submitted to the
> file.  How much time would you like to get that?

R. 125.  The ALJ gave the attorney two weeks to produce the requested information, but also told the attorney that he could ask for more time if he needed it.  R. 125.

Millburg testified that prior to receiving the in-home aide, the tasks of washing laundry and dishes were done "between me and my wife."   Their daughter made their bed and put on clean sheets.  Before the aide came, Millburg did grocery shopping "with the help of my parents."  Millburg said that he currently went to the grocery store with the aide.  He rode in a cart at the store and the aide did any lifting for him. R. 126-28.

Millburg went out to visit with friends, family, or relatives "once a week or less," and friend, family, or relatives visited him at home, "once a week or less."  Six months before the hearing, Millburg visited with others twice a week.  R. 129-30.  On Sundays, Millburg went to Bible class and church services.  R. 131, 134.

Millburg testified that could not lift very much.  He testified, "I can hardly – can barely even carry milk into my house anymore.  I have to have the assistant help me carry groceries because I can barely it [sic]. I can't carry them anymore."  Millburg stated that his condition had gotten worse in the six months before the hearing.  R. 139.

Millburg's attorney asked Millburg if he thought he could do his past

work.  Millburg replied,

> I don't believe so, no, just to sit and answer phones, I can't sit
> here for the amount of time we've sat here without being in
> extreme pain.  I can't – if I – and once I'm in this pain, I'm going
> to go home and I'm going to take the harder medicine to try and
> get me out of pain this afternoon.

R. 140.  Millburg said that the back pain made his anxiety worse and his

depression worse.  R. 140.

Millburg indicated that his primary care physician Dr. Hansen told him

that "he didn't think I'd be able to work, any function, without hurting my

back worse due to the way my body – my back and my other medical

issues were deteriorating."  R. 142.  Millburg testified that Dr. Hansen wrote

a letter to set forth what he thought about Millburg's condition.  Millburg

said that he gave the letter to his attorney at that time.  R. 142-43.

Vocational expert Hammond then testified.  The ALJ asked

Hammond to assume the following hypothetical situation,

> I'd like you to assume we have an individual the same
> age, education, and experience as the claimant.  This individual
> is limited to light work; limited to occasional postural activities
> and limited balancing; needs to avoid concentrated exposure to
> fumes, odors, dusts, and gases; limited to frequent fingering
> bilaterally.
>
> Because of all the individual's mental impairments and
> symptoms combined, the individual may, during times of
> symptoms exacerbation, have moderate limitations in

concentration, persistence and/or pace when attempting complex or detailer tasks.  So the individual is limited to jobs that do not require complex or detailed job processes, little in the way of change in job processes during the day, jobs that can be learned in 30 days or fewer and jobs with multi-step self-evident tasks easily resumed after momentary distraction.

R. 151-52.  Hammond opined that such a person could not perform Millburg's past relevant work.  Hammond opined that such a person could perform other jobs in the national economy including the representative positions of assembler II in the lighting industry, with 2,500 such job in Illinois, and 109,000 nationally; bench assembly in the rubber and plastics industry, with 2,400 such jobs in Illinois, and 118,000 nationally; and usher/ticket-taker with 900 such jobs in Illinois and 50,000 nationally. R. 152-53.

The ALJ asked Hammond if the person described in the hypothetical question could perform any sedentary jobs.  Hammond opined that the person could perform the jobs of a sealer in the pharmaceutical industry, with 1,100 such jobs in Illinois and 80,000 nationally; and a semiconductor bonder, with 1,000 such jobs in Illinois, and 70,000 nationally.  R. 153.

Hammond opined that the individual could not work if he missed four days of work per month.  Hammond opined that the individual could not work if he was less than 80 percent productive on the job.  R. 154.

THE DECISION OF THE ALJ

On December 8, 2014, the ALJ issued his decision.  R. 15-43.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of his age, education and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet this requirement at Step 3, the claimant's condition

must meet or be equal to the criteria of one of the impairments specified in

20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the

ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ found that Millburg met his burden at Steps 1 and 2.  He had

not engaged in substantial gainful activity since 2009, and he suffered from

severe impairments of disorder of the spine, fibromyalgia, cardiomyopathy,

bilateral carpal and cubital tunnel syndrome, obstructive sleep apnea,

asthma, obesity, and depression.  The ALJ found at Step 3 that none of

Millburg's impairments or combination of impairments met or equaled a

Listing.  R. 17-18.

At Step 4, the ALJ found that Millburg had the following RFC:

After careful consideration of the entire record, the undersigned
finds that the claimant has the residual functional capacity to
perform light work as defined in 20 CFR §§404.1567(b) and
416.967(b) except the claimant is limited to no more than
occasional climbing, stooping, kneeling, crouching, and
crawling; no more than frequent fingering, and he needs to

avoid concentrated exposure to fumes, odors, dusts and gases.
Because of all the claimant's mental impairments and
symptoms combined, he may, during times of symptoms
exacerbation, have moderate limitations in concentration,
persistence and/or pace when attempting complex or detailed
tasks, so the claimant is limited to jobs that do not require
complex or detailed job processes, little in the way of change in
job process from day to day, jobs that can be learned in 30
days or fewer, and jobs with multi- step, self-evident tasks,
easily resumed after momentary distraction.

R. 22.  The ALJ concluded that Millburg's medical records supported the

opinions of Drs. Panepinto and Hinchen.  Dr. Panepinto filled an RFC form

on April 1, 2013.  R. 194-96.  Dr. Hinchen agreed with Dr. Panepinto in a

form filled out on August 14, 2013.  R. 226-28. The ALJ noted that Millburg

worked with many of these same conditions for years prior to 2009.  The

ALJ found  Millburg's claimed pain levels to be inconsistent with the

medical evidence that showed only mild back problems.  The ALJ noted

that Millburg testified that he had five bulging discs, but the medical

evidence only showed one or two mild to moderate bulging discs and only

mild to very mild problems otherwise.  Millburg's motor strength and range

of motion were consistently normal.  The ALJ noted that Millburg could

ambulate without any assistance.  The ALJ stated that evidence of

fibromyalgia was infrequently mentioned in the medical records.  The ALJ

noted that Millburg's asthma and sleep apnea were controlled.  R. 38-39

The ALJ relied on Dr. Patil's assessments of GAF scores of 55 and 70. The ALJ stated that these scores showed mild to moderate limitations due to Millburg's depression. The ALJ also noted the mild memory loss found at the Memory Clinic testing. The ALJ accommodated those functional impairments by limiting the RFC to jobs that did not involve complex processes, could be learned in 30 days or less, and consisted of self-evident tasks that could be resumed easily. R. 39.

The ALJ also relied on evidence regarding Millburg's social interactions to support his RFC assessment. The ALJ noted that he visited with people weekly and went to church weekly. The ALJ stated that he seemed to get along well with other people. The ALJ found that these facts supported the opinions of Drs. Hudspeth and Boyenga that Millburg could tolerate interactions with others in a work setting. R. 39-40.

In making these findings, the ALJ found that Millburg's testimony and statements in the medical records were not credible regarding the severity of the functional limitations caused by his pain. The ALJ noted that Millburg testified that he had five bulging discs when he did not. The medical records showed mild to moderate bulging at T10-11 and 11-12, and only mild bulges elsewhere. The ALJ found this to be an exaggeration of his condition. The ALJ also found that Millburg testified that the in-home aide

was there for both his wife and him, but the records showed that the aide

was there to assist his wife only.  Lastly, the ALJ found that Millburg

exaggerated the pain he was suffering at the hearing.  The ALJ stated that

the hearing started at 12:50 p.m., and at 1:51 pm, Millburg testified that he

could not sit as long as he had without severe pain.  The ALJ stated that

Millburg sat for the remaining 34 minutes of the hearing without difficulty.

The ALJ stated that Millburg remained focused throughout the hearing,

never showed signs of distress, and could answer questions without

difficulty.  The ALJ found that these inconsistencies indicated that Millburg's

statements about the severity of his pain were not credible.  R. 40.  The

ALJ stated that he disregarded Millburg's subjective statements that were

not credible and only considered the objective information in the medical

records.  The ALJ further stated he gave little weight to any medical or

medically related opinions based "solely or primarily on the subjective

statement of the claimant."  R. 40-41.

The ALJ also disregarded Dr. Hansen's opinion set forth in the

December 28, 2012 letter.  The ALJ stated:

> Dr. Hansen's opinion is deserving of essentially no
> weight.  First, the issue as to disability is reserved to the
> Commissioner.  Second, other than stating the claimant's
> depression and anxiety reduced interaction with the general
> public, Dr. Hansen has merely set forth a list of diagnoses
> without any explanation for why these conditions are disabling.

> None of the claimant's conditions, either considered singularly
> or together, is automatically disabling.  All of these conditions
> are generally amenable to treatment and potentially
> controllable.  Many people work despite these individual
> conditions and even combinations of these conditions.
> Dr. Hansen has failed to provide any rationale for why the
> claimant's experience of this combination of symptoms renders
> him incapable of performing any work activity when other
> people with these conditions do successfully work.

R. 32-33.

The ALJ found at Step 4 that Millburg could not return to his past relevant work based on the RFC finding and the opinions of vocational expert Hammond.  R. 41.

As Step 5, the ALJ found that Millburg could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R., Part 404 Subpart P, Appendix 2, and Hammond's opinions that Millburg could perform the representative jobs of assembler II, bench assembly, usher/ticket taker, sealer, and semiconductor bonder.  R. 41-42.  The ALJ concluded that Millburg was not disabled.

Millburg appealed the decision of the ALJ.  On August 17, 2015, the Appeals Council denied Millburg's request for review.  The decision of the ALJ became the final decision of the Defendant Commissioner.  R. 1. Millburg then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate, at least minimally, his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ failed to build an accurate and logical bridge to his conclusion based upon the evidence and the ALJ's consideration of the evidence.  In Adaire v. Colvin, 778 F.3d 685, 687 (7th Cir. 2015), the Seventh Circuit noted that ALJs make the recurrent error of discounting pain testimony that can't be attributed to "objective injuries" or illnesses – the kind that are revealed by x-rays.  The Court noted in Adaire that the Administration's own regulation stated that an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability may not be disregarded solely because they are not substantiated by objective medical evidence, citing SSR 96-7p(4).  Id. at 687.

The Social Security Administration's ruling in SSR 96-7p(4) was superseded by its ruling in SSR 16-3p on March 16, 2016.  However, the Social Security Administration's ruling in SSR 16-3p, 2016 WL 1119029, did not change the requirement that statements of a claimant concerning intensity, persistence, and limiting effect of symptoms may not be disregarded.  SSR 16-3p says that the Social Security Administration will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms

alleged by the individual. <u>Id</u>. at *5.  The ruling states that the ALJ will

consider an individual's statements about the intensity, persistence, and

limiting effects of symptoms, and will evaluate whether the statements are

consistent with the objective medical evidence and the other evidence

provided. <u>Id</u>. at *6.  The ruling also indicates non-medical sources, such as

statements made by family and friends are to be considered by the ALJ,

and the ALJ will consider any personal observations of the individual in

terms of how consistent the observations are with the individual's

statements about his or her symptoms as well as with all the evidence in

the file. <u>Id</u>. at *7.

As noted above, in SSR 16-3p, the Social Security Administration

indicated it would eliminate the use of the term "credibility".  The ruling

further clarified that subjective symptom evaluation is not an examination of

an individual's character.  <u>Id</u>. at *1.  SSR 16-3p clearly states that, in

evaluating an individual's symptoms, ALJs are not assessing the

individual's overall character or truthfulness and the focus of the evaluation

of individual's symptoms should not be to determine whether the claimant

is a truthful person, but, rather focus on whether the evidence establishes a

medically determinable impairment that could reasonably be expected to

produce the individual symptoms, and whether those symptoms limit the individual's ability to perform work-related activities.  Id. at *10.

The ALJ's decision in this case was made prior to the effective date of SSR 16-3p.  The Court determines that SSR 16-3p applies retroactively to final decisions made before the March 16, 2016, effective date of SSR 16-3p.[13]

The ALJ acknowledged that the claimant has long standing back pain and MRIs have revealed degenerative changes, disc bulging, and other abnormalities.  The ALJ noted that it is the chronic severe spinal pain that claimant has indicated is his most limiting condition and acknowledges that spinal disorders are a severe impairment. R. 18. The ALJ also noted that, although severe spinal pain is not a significant impairment, claimant also complained of more generalized pain and has been assessed with fibromyalgia, and this would be considered severe as well.  The ALJ also

---

[13] A new statement by an administrative agency generally applies retroactively to administrative decisions that are subject to judicial review on the effective date of the statement if the statement only clarifies an existing ruling.  A new statement generally does not apply retroactively if the new statement makes a substantive change in the law.  Pope v. Shalala, 998 F.2d 473, 482-83 (7th Cir. 1993) overruled on other grounds, Johnson v. Apfel, 189 F.3d 561, 562-63 (7th Cir. 1999).  Courts give great weight to an agency's intent and interpretation of the ruling, but the agency's interpretation is not dispositive.  The agency cannot make a substantive change and call it a clarification.  Id., at 483.  The Administration stated that SSR 16-3p was a clarification.   SSR 16-3p, 2016 WL 1119029, at *1. The Court agrees with the Administration's characterization.  Pursuant to the Seventh Circuit's guidance in Pope v. Shalala, SSR 16-3p applies retroactively to the ALJ's decision in this case.  At least five other courts in this Circuit have also concluded that SSR 16-3p applies retroactively.  McCammond v. Colvin, 2016 WL 3595736, at *2-4 (N.D. Ill. July 5, 2016); Farrar v. Colvin, 2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016); Lockwood v. Colvin, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016); Hapberg v. Colvin, 2016 WL 1660493, at *6 (N.D. Ill. April 27, 2016); Pietruszynski v. Colvin, 2016 WL 1535158, at *6 n.6 (N.D. Ill. April 14, 2016).

noted that the claimant reported increased back pain and increased weight over the past two years.  R. 36.

The ALJ made a specific finding of the claimant's credibility, as he was required to do by SSR 96-7p at the time of his decision.  The ALJ indicated that his credibility assessment was used to determine the level of the claimant's credibility when it came to his subjective statements. Presumably the ALJ refers primarily to claimant's statements related to back pain.  The ALJ stated the claimant's subjective statements are not credible evidence in support of his alleged level of limitations.  Based upon his finding concerning the claimant's level of credibility, the ALJ determined that he was giving little weight to any medical or medically related opinions that are based solely or primarily on the subjective statements of the claimant.  The ALJ does not specify to which medical or medically related opinions he assigned little weight due to the lack of credibility of the subjective statements of the claimant.  R. 40.

The ALJ's discounting of the claimant's subjective statements regarding his pain and discounting medical or medically related opinions due to discrediting of the claimant's statements regarding pain appear not to be based upon the medical evidence in the record.  The discounting

appears to be an assessment of the claimant's overall character or
truthfulness which SSR 16-3p repudiates.

The ALJ characterized the "most glaring" inconsistency of the
claimant's testimony to be the claimant's statement that doctors had told
him he had "five bulging / herniated discs".  The ALJ states there is no
objective evidence in the file to corroborate this testimony.  R. 40.

The evidence in the record indicates that Plaintiff did have five
bulging / herniated discs.  A lumbar spine MRI of the Plaintiff on June 14,
2011 revealed three mildly bulging discs at L2-3, L3-4, and L4-5.
Additionally, the same MRI revealed broad based disc herniation at T11-12,
for a total of four bulging or herniated discs.  R. 27.  R. 993.  In November
of 2012, claimant underwent an MRI of the cervical thorasic lumbar spine
which shows small to moderate sized disc herniation at T10-11 and T11-
12.  This MRI, in combination with the previous MRI in June of 2011, shows
five "bulging / herniated discs" had been indicated by the MRIs.  The ALJ,
however, used the supposed lack of evidence of five "bulging / herniated"
discs to disregard Millburg's subjective claims of back pain.

The second "inconsistency" which the ALJ used to discount
claimant's claims of back pain was his statement that a personal assistant
working in the Millburg home was "for both him and his wife".  R. 40.  The

ALJ, after reviewing records of Health Alliance Connect concerning

providing a personal assistant for the claimant's wife, used those records to

discredit the testimony of the claimant.  The records reviewed by the ALJ in

making this determination were records concerning the claimant's wife and

had nothing to do with the physical condition of the claimant.  Clearly, the

ALJ used what he determined to be testimonial inconsistency regarding

claimant's wife's assignment of an assistant to determine that the claimant

was not truthful regarding his subjective assertions of back pain.  Hence,

the ALJ discounted the claimant's claims of pain based upon his wife's

records which state nothing about the claimant's physical condition.

Discussing the assignment of the "at home aid" to his wife during his

testimony, the claimant indicated that his wife had received an in-home aid

who was helping her and helping himself because he could no longer

prepare meals for his wife at home.  R. 123.

Finally, the ALJ discounted the claimant's subjective claims of pain by

his observations that the claimant was able to sit at the hearing for

approximately an hour and a half and "never showed any signs of pain or

distress".  R. 40.  The ALJ pointed to the Plaintiff's statement that he could

not "sit here for the amount of time I sat here" without severe pain.  R. 14,

40.  When Millburg was asked his pain level during the hearing, he replied

the pain was 7 or 8 on a 10 point scale. R. 144.  The assumption that the

Plaintiff was in no pain from sitting for an hour and a half again is based on

the ALJ's subjective evaluation that the Plaintiff was not telling the truth

regarding the subjective claims of pain based on the ALJ's observation of

the claimant at the hearing.

The ALJ made subjective evaluations of the claimant's ability to work

which were not specifically related to the medical records. These are

illustrated by the ALJ's following comments:

> The claimant is morbidly obese, but does not appear to be
> making much of a genuine effort to lose weight, using his
> pain as an excuse to not really exercise; even though
> exercising and improving his overall conditioning could be
> expected to help a number of his health problems . . . The
> medical records suggest that the claimant could likely
> experience improvement in many of his interrelated medical
> conditions if he would adopt a more positive attitude, accept
> that he will likely always experience some degree of pain,
> and focus on taking positive steps to reduce his pain as
> much as possible and better control his other symptoms by
> focusing on improving his overall level of conditioning,
> engaging in regular exercise, losing weight, and finding no
> cost or low cost activities (as his financial situation is poor)
> that are not too physically demanding and allowing him to
> focus on something other than pain and to obtain a sense of
> success, accomplishment, self-worth (such as his more
> recent efforts to become more involved at the church and
> volunteering with the Boy Scouts).

R. 39.

These "suggestions" of the ALJ fail to take into account the evidence in the record regarding the pain experienced by the Plaintiff and his attempts to alleviate the pain.  For instance, in 2010 the Plaintiff was given epidural steroid injections into his spine for pain due to lumbar degenerative disease.  R. 528-32.  In January of 2011, a medical examination assessed chronic back pain consistent with degeneration, followed by regeneration and recalcification of the vertebrae.  R. 524.  In April of 2011, Plaintiff again reported that he had chronic low back pain and was trying to lose weight. R. 679, 682.  In August of 2011, Plaintiff again received an epidural injection at the T11-12 level of his spine.  Later in August of 2011, Plaintiff indicated he had back pain and on examination on rotation of cervical spine was assessed with chronic lower back pain and lumbar disc degeneration.  R. 646-47.  In January of 2012, Plaintiff received another epidural steroid injection for pain indicated by an EMG study.  R. 544-45.  In February of 2012, Plaintiff was again given bilateral sacroiliac joint injections for pain due to bilateral sacrolitis.  R. 550-51.

The "suggestions" of the ALJ also ignore the contrary evidence regarding the factors he discusses. The Plaintiff's brother reported that Millburg had to quit Scouting because he was unable to keep up with the children due to his pain and had to stop assisting at church because he

could not stand for ten minutes.  The Plaintiff's brother also noted that Millburg's condition had worsened over the past couple of years.

The licensed professional counselor who saw Millburg in November of 2011, observed that he was in obvious pain and had difficulty sitting for any length of time.  R. 1396-97.

Plaintiff indicated he had tried physical therapy, but received no benefit.  Specifically, claimant stated he went to the YMCA daily to do water exercises in 2011.  R. 1394-95.  In 2012, Plaintiff reported that nothing made his pain better and he did water exercises daily, but the exercises did not help anymore.  R. 1061.  In 2013, Plaintiff reported his pain was increasing and his back was deteriorating. Plaintiff indicated that he felt exhausted, but was doing water exercises which helped in the beginning, but in the last couple of years had done nothing to keep his condition from becoming worse.  R. 460.  The "suggestions" of the ALJ are indicative of his completely disregarding subjective and objective evidence relating to the claimant's back pain and his efforts to alleviate the pain.  The ALJ simply suggests that the Plaintiff should keep doing activities which have produced no relief from the pain in order to improve his condition.

The ALJ also suggests that the claimant lose weight.  There is no question that the claimant is morbidly obese.  The claimant testified he had

attempted to lose weight, but had been unable to do so. There is no evidence cited by the ALJ that the medical sources prescribed weight loss to the claimant and he failed to follow their advice. SSR 02-1p, 2002 WL 34686281, deals with the evaluation of obesity. The Social Security Administration has noted that an obesity evaluation is rarely used as a basis for denial of benefits for "failure to follow prescribed treatment". Id. at *9. The ruling indicates that a statement by a treating source that an individual "should" lose weight or has "been advised" to get more exercise is not prescribed treatment. Id. at *9.

The claimant stated that the epidural steroid injections only provided him relief for a few days. R. 137. Plaintiff also testified that sitting during the hearing was causing him extreme pain which got worse the longer he sat during the hearing. R. 138.

Millburg also testified that the limitations on his activities had progressively gotten worse (R. 139), which is consistent with the degenerative nature of his back problems mentioned above.

In viewing the subjective accounts of chronic pain by the Plaintiff and his family, the ALJ noted that "many of his conditions are long standing and he worked for years despite these conditions". R. 38. The ALJ does not indicate when Millburg last worked. The ALJ offers no acknowledgement

that the worsening back pain of the claimant may be based on the

degenerative nature of his disc disease.  The Plaintiff has never asserted

that the severity of his pain remained the same for years.  In 2014, Millburg

reported increased back pain and increased weight over the past two

years.  R. 270.  As the Seventh Circuit observed in Hill v. Colvin, 807 F.3d

862, 868-869 (7th Cir. 2015), the ALJ's reasoning may be flawed because

he ignores the fact that "degenerative" conditions get worse over time.

 As noted above, the ALJ in his credibility evaluation of the claimant

clearly has made a judgment that the claimant is not truthful in his

complaints of pain, particularly his back pain.  The discounting of these

subjective complaints of pain made by Millburg is due to the ALJ's

evaluation of his overall character and truthfulness, as opposed to an

evaluation of all the evidence, including Millburg's subjective complaints of

pain, reports of third party non-medical sources regarding the limitation of

Plaintiff's activity caused by his pain, and consideration of the degenerative

nature of Plaintiff's back disorder.

 Likewise, the ALJ failed to consider or discuss the effect of Plaintiff's

morbid obesity on subjective complaints regarding back pain.  Based upon

the ALJ's axiom that no opinion can have greater credibility than the

information on which it is based, the ALJ gave little weight to any medical

or medically related opinions that are based solely or primarily on the subjective statements of the claimant.  There is no specification of how or which medical or medical related opinions were given little weight or disregarded.  The ALJ apparently gave no consideration to the multiple epidural injections which treating physicians administered to the claimant. There is certainly a reasonable inference that these doctors would not have subjected the claimant to epidural injections of steroids on multiple occasions if they did not give credence to the claimant's statements regarding back pain.

Rather than considering and discussing all the evidence, the medical sources relied on by the ALJ were primarily the opinions of the state agency assessments.  R. 38.  However, neither of the state agency doctors, Dr. Panepinto, nor Dr. Hinchen, examined or met with the claimant and from a review of their reports, neither considered his subjective description of the back pain related to the treating physicians.

The credibility evaluation of the ALJ, as discussed above, was based upon statements which were not supported by the record (no diagnosis of five bulging / herniated discs), on medical records concerning the assignment of a personal assistant to assist the claimant's wife, and the personal observations of the ALJ during the hearing.  Personal

observations made by a fact finder generally assess the truthfulness of the witness in an adversarial litigation.  <u>See</u> <u>e.g.</u>, <u>United States v. Hamilton</u>, 107 F.3d 499, 503 (7th Cir. 1997) ("[F]ace-to-face confrontation ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness.").  SSR 16-3p specifically prohibits this adversarial approach of judging the witness's truthfulness.  SSR 16-3p, 2016 WL 1119029, at *10.

Under the guidance of SSR 16-3p, the ALJ's credibility determination was error that requires reversal.  On remand the ALJ can evaluate statements regarding the intensity, persistence, and limiting effects of Millburg's symptoms in accordance with SSR 16-3p.  In evaluating statements in the record regarding the intensity, persistence, and limiting effects of Millburg's symptoms, the ALJ should also consider the aggregate effects of Millburg's obesity, depression, anxiety, and other conditions, as they may have been impacted or triggered by the claimant's pain.  The ALJ should make a multiple impairments analysis of claimant's residual functional capacity.  See <u>Clifford v. Apfel</u>, 227 F.3d. 863, 873-874 (7th Cir. 2000).

THEREFORE, THIS COURT RECOMMENDS that Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support of

3:15-cv-03298-SEM-TSH   # 19   Page 63 of 63

Remand/Vacate of Decision Denying Disability (d/e 14) be ALLOWED, the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) be DENIED, and the decision of the Commissioner be REVERSED and REMANDED pursuant to Sentence Four of 42 U.S.C. 405(g).

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   January 20, 2017


_s/ Tom Schanzle-Haskins_

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE

Page **63** of **63**